THOMAS H. LUCKETT *vs.* STEPHEN WHITE AND OTHERS.— *December,* 1839.

After an order of publication against non-resident defendants to a bill in chancery has been published, and a decree passed taking the bill *pro confesso,* in consequence of the neglect of the defendants to appear and answer, the allegations of the bill are considered as admitted.

A devise to one of the testator's sons of his real estate, "he paying to his younger brother one hundred pounds current money," creates a charge upon the lands devised, which a court of equity will enforce.

It is too late to object to a bill upon the ground of multifariousness, after a decree pro confesso has passed; and a demurrer is the proper form in which such an objection should be presented.

The admissibility of a paper purporting to be a will executed and proved in Virginia, cannot be objected to in the Court of Appeals, no objection having been taken to it in the Court of Chancery.

Luckett *vs.* White, *et al.*—1839.

The provisions of the act of 1795, ch. 88, authorising non-resident defendants, against whom decrees pro confesso may have passed for want of appearance after publication, to require a review of the same by the Chancellor within eighteen months from the date of such decrees, applies also to the decrees of the Court of Appeals.

The Chancellor, in such a case, may entertain a bill to review a decree of the Court of Appeals.

APPEAL from the Court of Chancery.

The original bill in this cause was filed on the 27th June, 1825, by the appellant, *Thomas H. Luckett*, of *Loudon* county, *Virginia*. The will of his father, *Thomas H. Luckett*, was dated on the 27th December 1786, and after declaring that his wife *Elizabeth* should have the full possession of his whole estate, real and personal, whilst she continued his widow, and that she raise and educate his children, proceeded to devise as follows:

"I give and bequeath to my oldest son *Otho*, his heirs and assigns forever, all the land that I bought of *William Hough*, in *Montgomery* county, *Maryland*, he the said *Otho* paying to his younger brother, not yet baptized, (the complainant,) one hundred pounds current money of *Virginia*, as at this time valued."

The testator then made a similar bequest to his son *Valentine*, of all the land bought of his brother *John Luckett* in the same county, subject to a like charge of one hundred pounds.

The bill alleged that, the land called "*Conjuror's Disappointment*" and "*Georgia*" were purchased from *John Luckett*. That "*Gleanings*" and "*Resurvey upon Discord*" were purchased from *William Hough*, and that the will, executed according to the laws of *Maryland*, was duly admitted to probat in *Virginia;* that *Elizabeth Luckett* died a widow in 1817. That in 1805 the said *Elizabeth* relinquished to *Otho* and *Valentine* respectively, all claim she had to the land devised to them, to enable them to convey it to one *Samuel Clapham* of *Virginia*, and said land was accordingly so conveyed; at which time complainant was a minor. That after he arrived at age, and became entitled to said legacies, he exerted himself to procure

payment of the same from his said brothers, and from the said Clapham, who had purchased the said lands, and would long since have resorted to suits at law, but for the unsettled residence of his brothers, so that he could not know in what place to institute such suits successfully; and so long as there was any, the remotest probability of being able to recover the said legacies from his brothers, his sense of justice would not allow him for a moment to entertain the idea of resorting to the land upon which the said legacies had been thus charged, as the same had by a fair bargain and sale passed into other hands, to wit, into the hands of the said *Clapham* for a valuable consideration, but not without notice of the said incumbrance; that his brothers being unable to pay, he again applied to *Clapham*, who had now sold the land to *Daniel Trundle;* that both *Clapham* and *Trundle* knew that the said legacies were a charge upon the lands, when they respectively purchased the same, and have been continually reminded thereof, and neither of them are innocent purchasers without notice. The bill also claimed interest on the said legacies from the period of the father's death, or at least from the time of *Elizabeth's* acquittance in 1805 to her sons: also, publication against *Clapham*, and *Otho*, and *Valentine*, and subpœna against *Trundle;* a sale of the lands; payment of the legacies, and for general relief.

With this bill were filed as exhibits, deeds of 30th December 1784, and 4th March 1785, from *John Luckett* to *Thomas H. Luckett* the elder; the will of said *Thomas H. Luckett;* the release of *Elizabeth Luckett* of 6th May 1805; the deed of *William Hough* and *Elizabeth Luckett* of 30th October 1800, to *Otho Luckett;* the deed of 6th May 1805 from *O. W. Luckett* and *Valentine P. Luckett* to *Samuel Clapham;* the deed of 2nd April 1812, from *Samuel Clapham* to *Daniel Trundle;* proposal from *T. H. Luckett* of 13th May 1823; to *Samuel Clapham* for a reference, and his refusal.

An order of publication as to *Otho* and *Valentine Luckett* and *Samuel Clapham*, was passed on the 27th June 1825.

*Daniel Trundle* appeared and answered this bill. He ad-

mitted that he did purchase of the defendant *Clapham* the lands described in the complainant's exhibit No. 9;—that he obtained a conveyance for the same in the year 1812, and has ever since been in the undisturbed possession of the land thereby conveyed, without having ever had it intimated to him until the year 1823, that the complainant or any other person had any claim on the said land. This defendant admits, that in the course of the year 1823, the complainant did mention to this defendant that he had a claim under the will of his father;—that he had then paid the whole of the purchase money, and could not suppose why, if the claim really existed and had not been satisfied, steps should not have been previously taken to recover it. This defendant states that the complainant concealed the claim which he now sets up from this defendant, and suffered this defendant to pay the purchase money without any notice of it, although this defendant is unable to state what is the age of the complainant, yet if the paper which he has filed as a copy of his father's will be correct, (which this defendant cannot admit,) and if the complainant be the person mentioned therein he must have been born on or before the year 1786, and of course must have been twenty-one years of age in 1807; the purchase was made by this defendant in 1812, and yet no claim was set up—no notice of any such claim was given to this defendant—until the year 1823. Such conduct on the part of the complainant would, this defendant is advised, have deprived the complainant of all equity as against this defendant or the land in his possession, if he could have shown himself entitled to relief had an earlier application been made for it. This defendant expressly denies that, at the time he made the purchase as aforesaid, or when he paid the purchase money, or when he took the conveyance for the land, he had any notice of the claim of the complainant now set up, or any reason to believe that there was any lien upon the land. He purchased of the defendant *Clapham*, who obtained his deed from the eldest son of the complainant's father, who died in 1786 or 1787, and of course the defendant *Otho W. Luckett* was the heir at law of the

father. This defendant has long since paid for said land a full and valuable consideration, without notice of the claim of the complainant; he therefore insists that, being a *bona fide* purchaser without notice, the land in his hands could not be charged with the payment of any claim, as stated by the complainant, even if the claim could not be resisted by this defendant on other grounds. But this defendant insists that the length of time which has been suffered to elapse since the claim, if it ever existed, might have been enforced, before the filing of this bill, or the giving of any notice to this defendant of the claim, would of itself furnish a bar to any relief, and he pleads and insists upon the same, as furnishing proof that the claim, if it was just, has been satisfied. As to what is stated in the bill of complaint in order to account for the delay, this defendant does not admit the same; the defendants *Otho* and *Valentine* and the complainant resided a number of years in *Maryland*, and as to the insolvency of said *Otho* and *Valentine*, this defendant herewith produces exhibit A, which he prays may be taken as a part of this answer, and which will show that both of them applied for the benefit of the acts of insolvency as long ago as the year 1810. This defendant does not admit the allegation in the bill with regard to the defendant *Clapham*, and if it was true, this defendant insists that it could not prejudice this defendant. This defendant does not believe, and does not admit, that the complainant's exhibits, with the exception of the deed to this defendant, are correct. He believes it to be true that the mother of the complainant never married again. He does not know when either she or her husband died. This defendant has already denied all knowledge of the legacy at the time he purchased the land; what knowledge *Clapham* had, this defendant is unable to state. This defendant has already stated when the complainant first stated to him his claim, and never afterwards, according to the recollection of this defendant.

*Samuel Clapham* also appeared and answered said bill. He admitted the statement of complainant's bill to be correct relative to his father's land, and will, which was made in the

year 1786, and that it may have been executed and attested according to the then laws of *Maryland,* and admitted to probate in the court of *Loudon* county, *Virginia;* yet of its due and legal execution he does not pretend to judge. He admits the devises to *Otho W. Luckett* and *Valentine B. Luckett,* subject to the payment of £200, to be correctly stated in the bill; which sum was to be paid to the complainant, at that time unnamed; and that all his land, together with his personal estate, was devised to his wife, while she continued his widow, and refers to the will as part of his answer; that *Elizabeth Luckett* moved to *Kentucky* he believes in the year 1816, and died as he has been informed in the year 1817, a single and unmarried woman.

This respondent admits the deeds mentioned from *E. Luckett* to her sons, but cannot say whether there was or was not a consideration absolutely given—they were made preparatory to their deeds to him, and for their true construction he refers to the deeds themselves. At the time the deeds were made, the complainant was privy to all the transactions relative to the bargain, and it was distinctly understood that *E. Luckett* was to pay the money which the sons were bound for; the deeds from *E. Luckett* to her sons, and from them to this respondent, all bear date in May 1805; and *Elizabeth Luckett* had always acted for the complainant, and he confirmed her acts when he came of age. The very land on which the complainant's father died, lying in Loudon county, Virginia, was during his minority sold by her to this respondent, and the purchase money paid to her, and long after he had arrived at lawful age (he thinks in 1816) he made him a deed for the land, to a copy of which he begs leave to refer, and never insinuated a claim against this respondent. His mother moved into *Virginia* from *Fredericktown, Maryland,* and lived on land under the direction of this respondent; the complainant lived with her; and in 1816 he thinks she removed to *Kentucky,* and he went with her; from 1805, when the deeds were executed, until the period of removal, he was often, very often, with the respondent, and might have communicated his pretensions, but nev-

er did, notwithstanding his circumstances were needy.

And further answering saith, that about the year        , being since the deeds of 1805, *Valentine* and *Otho W. Luckett* availed themselves of the insolvent debtors' act in the State of *Maryland*.

On the 26th February 1829 the complainant filed an amended and supplemental bill, and bill of revivor.  This bill alleged the death of *Samuel Clapham* without heirs, leaving *Elizabeth Clapham* his widow; that in the original bill it is stated that the said *Samuel Clapham* had sold all the lands which he purchased from said *Valentine* and *Otho* to *Daniel Trundle*, whereas, it should have been alleged that, the said *Clapham* had sold the parcel of land called "*Resurvey upon Discord*" to the said *Daniel Trundle*, and that the said *Samuel Clapham* did on the 17th day of June 1824, by deed executed by himself and wife of the one part, *James B. Murray* of the second part, and *James Thompson* of the city of *New York* of the third part, convey the said three parcels of land called "*Conjuror's Disappointment,*" "*Georgia*" and "*Gleanings,*" to the said *James B. Murray*, in trust, to sell the same for the payment and satisfaction of a debt due by the said *Samuel Clapham* to the said *James Thompson*, in case the said *Samuel Clapham* should not perform the condition of a bond referred to in the said deed of trust.  That the said *Samuel Clapham* failing to comply with the condition of the said bond, the lands mentioned in the aforesaid deed of trust were sold by the said *James B. Murray* to a certain *Eliza Thompson*, *Peter Augustine Jay*, and *Eliza Ratcliffee*, of the city of *New York*, executors of the last will and testament of the said *James Thompson*, and conveyed by deed bearing date the 9th day of June 1828.  Your orator alleges and charges that the said *James Thompson* and *James B. Murray* were aware and had full notice of your orator's claim to the said lands at the time of the execution of said deed of trust, and that the said *Eliza Thompson, Peter Augustine Jay*, and *Eliza Ratcliffe* knew of the said claim when they purchased the said land; the proceedings under the original bill of complaint being then

pending in this honorable court. That the said *Elizabeth Clapham* resides in *Virginia,* the said *Otho H. Luckett* and *Valentine P. Luckett* also reside in *Virginia,* as your orator believes, and the said *James B. Murray, Eliza Thompson, Peter A. Jay* and *Eliza Ratcliffe* in the city of *New York.*

The bill then prayed for an order of publication against the said parties, and for relief, &c.

The deeds referred to in this amended bill were filed with it as exhibits, and an order of publication having been passed and published, the chancellor, on the 9th October 1829, passed the following order:

The complainant having produced proof of the publication of the order passed on the 27th day of February 1829, according to the terms of said order, and the defendants, *Otho H. Luckett, Valentine P. Luckett, Elizabeth Clapham, James B. Murray, Eliza Thompson, Peter A. Jay* and *Eliza Ratcliffe,* not having appeared and answered the premises within the time limited by said order—it is thereupon this 9th day of October 1829, upon consideration of the original bill and exhibits, and all other the proceedings, adjudged, ordered and decreed, that the original bill be taken *pro confesso* against the said *Otho H. Luckett* and the said *Valentine P. Luckett,* and the amended and supplemental bill, and bill of revivor, be also taken *pro confesso* against the said *Otho H. Luckett* and *Valentine P. Luckett,* and the said *Elizabeth Clapham, James B. Murray, Eliza Thompson, Peter A. Jay* and *Eliza Ratcliffe.*

The general replication was now entered, and a commission issued to take proof.

On the 8th May 1832, the complainant filed another bill of revivor, alleging the death of *Daniel Trundle,* leaving as his heirs *Mary Elizabeth,* the wife of *Benjamin Shriver,* and *Ann,* the wife of *Stephen White.*—*Prayer* to make them parties, &c.

The heirs of *Trundle* appeared and relied upon his answer to the original bill as their answer. A commission was issued and proof taken, which is sufficiently referred to in the opinion of this court.

At September term 1837, the Chancellor (BLAND) being of

opinion that, apart from the strong presumption against the plaintiff's claim, arising from great lapse of time, it was not sustained by legal, sufficient and convincing proof, dismissed the bill with costs.

From this decree *Thomas H. Luckett* appealed to this court.

The cause was submitted on the written arguments of counsel to BUCHANAN, C. J., STEPHEN, ARCHER, DORSEY, CHAMBERS, and SPENCE, J.

By S. PINKNEY and J. JOHNSON for the appellant, and
By J. C. COOKE and A. C. MAGRUDER for the appellees.

SPENCE, Judge, delivered the opinion of the court.

The object of the bill in this cause is to coerce the payment of a legacy by the sale of certain real estate mentioned in the proceedings, upon the ground, as the bill alleges, that the same is made a charge thereon, under and by virtue of the last will and testament of a certain *Thomas H. Luckett.*

After filing the original bill, the complainant, as he alleges in his amended and supplemental bill, discovered that he had made a mistake, in charging in his original bill that *Trundle* had purchased all the lands devised by *Thomas H. Luckett* to his two sons *Otho W. Luckett* and *Valentine P. Luckett;* when the fact was, that the part of the said lands which was devised to *Valentine* had been conveyed by the said *Valentine* to a certain *Samuel Clapham,* and by said *Clapham* to a certain *James B. Murray.* Having discovered this error, and learning further that *Clapham,* one of the original defendants had died, the complainant filed his amended and supplemental bill, in which he charged the conveyance to *Murray,* and prayed that said *Murray, James Thompson, Eliza Thompson, Peter Augustus Jay* and *Eliza Ratcliffe* might be made parties to the bill, and the proceedings revived against the then representatives of *Clapham.*

The amended bill alleges that the defendants, *Otho H. Luckett, Valentine P. Luckett, James B. Murray, Eliza Thompson, Peter Augustus Jay* and *Eliza Ratcliffe,* were non residents,

and prayed an order of publication giving said non-resident parties notice of the substance and object of the original and amended bill, and requiring them to appear and shew cause by a certain day, if any they had, why the lands mentioned in the proceedings should not be sold as prayed.   On the 9th October 1829, the Chancellor passed a decree "that the amended and supplemental bills, and bill of revivor, &c., be taken pro confesso against *Otho* and *Valentine P. Luckett, Elizabeth Clapham, James B. Murray, Eliza Thompson, Peter A. Jay* and *Eliza Ratcliffe.*"   The *original* bill was also decreed to be taken pro confesso against *Otho* and *Valentine* only.

It may be well here to premise that this decree could have no operation or effect upon that portion of the land mentioned in the proceedings called "*Resurvey on Discord,*" which the testator by his will devised to his son *Otho,* because he, *Otho,* had conveyed the same tract of land to *S. Clapham,* and by *Clapham* it had been conveyed to a certain *Daniel Trundle,* who had appeared and put in his answer to the bill, and furthermore, the decree of the Chancellor of the 9th October 1829, was not designed to have any operation or effect upon *Trundle* or those claiming under him.

The first question which is presented for our decision is, what is the legal operation and effect of the Chancellor's decree of the 9th October 1829?

The neglect to answer, and the order or decree *pro confesso,* amounts to an admission of the allegations of the bill against all the parties against whom such decree passes.   *Robinson et al. vs. Townshend,* 3 *Gill & John.* 413.

The allegations in the bill in this case, therefore, being admitted by operation of the decree *pro confesso,* against all the parties against whom it passed, the next consideration is, are the allegations and averments in the bill sufficient to entitle the parties to the relief sought, and this enquiry necessarily leads to an examination of the allegations and averments in the bill.

The bill alleges that *Thomas H. Luckett* the testator, made his last will and testament, which was duly executed and attested, according to the then laws of the State of *Maryland,*

and admitted to probate and recorded ; that by the same, the three tracts of land, to wit, *"Conjuror's Disappointment,"* *"Georgia"* and *"Gleanings,"* were devised to *Valentine P. Luckett*, and the other tract or parcel of land called *"Resurvey upon Discord"* was devised to *Otho. W. Luckett*, upon the express condition that these devisees should each of them pay to the complainant (who is the younger brother described in said will as not yet baptized,) £100 current money of the commonwealth of *Virginia.*   The bill states that the testator devised the same lands to his wife *Elizabeth Luckett* during her sole and unmarried life ; that the said *Elizabeth Luckett* executed to the said devisees, *Valentine* and *Otho*, separate deeds of release, and acquittances of all her right and title to said tracts or parcels of land, so as aforesaid devised to them.   That the deeds from *Elizabeth Luckett* and *William Hough* to *Valentine P. Luckett* and *Otho W. Luckett* were executed for the purpose of enabling the said *Valentine* and *Otho* to sell said lands to a certain *Samuel Clapham*, which had been before agreed upon, and was thereby consummated on the same day, as will appear by copies of said deeds exhibited with and made a part of the bill.   The bill charges that no part of the legacy so charged upon said lands had ever been paid to the said complainant ; but that the said legacies were still due and unpaid.   The complainant prays that a decree might be passed for the sale of said lands, or so much thereof as might be necessary to pay the said legacies with interest.

Assuming then, as we necessarily must do, that the allegations in the bill are true—that *Thomas H. Luckett* the testator devised the said land called *"Conjuror's Disappointment,"* *"Georgia"* and *"Gleanings,"* to his son *Valentine*, his heirs and assigns forever, he paying to his younger brother not yet baptized, the sum of £100 current money of *Virginia*—the legacy is, according to the adjudicated cases, a charge upon the lands thus devised, and one which a court of equity will enforce.

If the objection urged in the argument, that the bill is multifarious, be true, it neither comes at the proper time, (the de-

·cree *pro confesso* having been passed,) nor in the regular and proper form, as it should have been presented by a demurrer. ·*Gibbs vs. Clagett et al.* 2 *Gill & John.* 24. *Story's Eq.* 224. ·*Coop. Eq. Plea.* 182.

We are therefore of opinion that there is error in the Chancellor's decree dismissing the complainant's bill, as to *Valen-tine P. Luckett, Elizabeth Clapham, James B. Murray, Eliza Thompson, Peter A. Jay* and *Eliza Ratcliffe.*

The next question which arises in this cause is,—whether there is error in the Chancellor's decree of the 10th October 1837, dismissing the complainant's bill with costs as to *Otho W. Luckett, Benjamin Shriver, Jr.* and *Mary Elizabeth* his wife, and *Stephen White* and *Ann* his wife?

The bill of revivor having suggested the death of *Daniel Trundle* and prayed that the suit and proceedings might stand revived against the said *Benjamin Shriver* and *Mary Elizabeth* his wife, and *Stephen White* and *Ann* his wife, the heirs at law of *Daniel Trundle. Daniel Trundle,* to whom *Samuel Clap-ham* had conveyed that part of the real estate mentioned in the proceedings called "*Resurvey on Discord,*" which the testator ·*Thos. H. Luckett* devised to his son *O. W. Luckett,* had appeared to the complainant's bill in his life time and put in his answer, and admitted that he purchased the land described in the proceedings of *Samuel Clapham* in the year 1812; that he paid the purchase money therefor and obtained a conveyance from said *Clapham,* but expressly denies in his answer, that at the time he made the purchase, or when he paid the purchase money, or when he took the conveyance for the land, he had any notice of the complainant's claim, attempted now to be set up, or any reason to believe there was any lien on the land; and insists that, being a *bona fide* purchaser, without notice, for a valuable consideration, the land in his hands could not be charged with the payment of the claim relied on by the complainant.

*Benjamin Shriver* and wife, and *White* and wife, put in their answers to the bill, and refer in their answers to the answer of

*Trundle,* their ancestor, and rely upon the statements and averments therein contained.

The argument of the solicitors on the part of the complainant insists, that there is proof sufficient in the record to carry home to *Trundle,* if not actual, at least constructive, notice of this charge. The answer, in the fullest and most unqualified terms, denies notice; and after a careful and patient examination of the record, we are constrained to say, that we have been unable to discover any proof in the proceedings, which can by any just interpretation be deemed to amount to the proof of notice. If we turn to the allegations in the bill which touch this point in the case, to ascertain what conclusions may be rationally and legitimately deduced from the language used, what is the result? This is the language of the bill,—"and so long as there was any the remotest probability of your orator's being able to recover the said legacy from his said brothers, his sense of justice would not allow him for a moment to entertain the idea of resorting to the said land upon which the said legacy had been charged, as the same had by a fair bargain and sale passed into other hands."—This is the language of the bill filed in the year 1825, to coerce the payment of this legacy out of the land devised to *Otho W. Luckett,* and which he had conveyed to *Clapham* on the 5th May 1805. The bill charges that *Clapham* conveyed the tract of land called the "*Resurvey upon Discord*" to *Daniel Trundle* on the 2nd of April 1812. *Trundle's* answer avers, that he has ever since that time been in the undisturbed possession, and never heard of this claim until some time in the year 1823. Can we in the absence of all positive proof, in the face of *Trundle's* answer, which fully and flatly denies notice, from such a statement of facts, reach the conclusion that *Trundle* had notice of this charge? We think not.

The doctrine of constructive notice has also been pressed upon us; but let us see with how much more success.

Constructive notice, says *Mr. Justice Storey,* ( *Com. on Eq.* 387,) "is in its nature no more than evidence of notice, the presumptions of which are so violent, that the court will not

allow even of its being controverted." And this learned judge thus illustrates his rule. "Where the party has possession or knowledge of a deed under which he claims his title, and it recites another deed, which shows a title in some other person, then the court will presume him to have notice of the contents of the latter, and will not permit him to introduce evidence to disprove it. And, generally, it may be stated as a rule on this subject, that where a purchaser cannot make out a title, but by a deed, which leads him to another fact, he shall be presumed to have knowledge of such fact." Now what is the fact of which *Daniel Trundle* shall be presumed to have knowledge? It is this: that the tract of land called "*Resurvey upon Discord*" is charged with the payment of a legacy of £100 with interest thereon from 1787, under and by virtue of the last will and testament of *Thomas H. Luckett.* Now all the proceedings admit that this will never has been admitted to probate or recorded in the State of *Maryland;* and it is conceded that *Daniel Trundle* has a deed from *Samuel Clapham* dated the 2nd April 1812, for this identical land; but in said deed there is not one word about *Thomas H. Luckett*—his will, or a legacy charged thereon—to be found. But, says the argument, *Mr. Trundle* must not stop here. Admit then that he must trace his title back. The next document is a deed from *O. W. Luckett* to *Samuel Clapham* for the same land, in which there is not a word to be found about the testator *Luckett* or his will; and again, we have the deeds from *Elizabeth Luckett* and *Wm. Hough* to *O. W. Luckett* for said lands, the latter of which recites, "that for the purpose of carrying into effect the contract heretofore, to wit, on the 24th July 1804, made between him the said *Wm. Hough* and *Thomas Hussey Luckett,* the late husband of the above named *Elizabeth* and father of the above named *Otho;* and also for and in consideration of £1186.10.5 to him in hand paid by the said *Elizabeth* and *Otho*," and there is not one word said of *Thomas H. Luckett's* will, a legacy or charge upon the lands conveyed. This deed recites that it is made for the purpose of carrying into effect a contract made with *Thomas H. Luckett* more than three years

before the will exhibited in this cause was executed.    Having traced this title to a point of time in its history anterior to any interest of *Thomas H. Luckett*, and having sought in vain to discover a fact, or facts which can, under this rule, fix this presumption upon *Trundle*, we are necessarily driven to another conclusion, which is entirely conclusive; namely, that this case is not within the rule upon which the argument was predicated, and that the averment in *Trundle's* answer is not invalidated or impaired.

The argument offered against the admissibility of the reported original will of *Thomas H. Luckett*, as evidence in this cause, finds a conclusive answer in the fact that it was not excepted to in the court below.

Under this view of the case, the court affirm the decree as to *Otho W. Luckett*, *Benjamin Shriver*, *Jr.* and *Elizabeth* his wife, and *Stephen White* and *Ann* his wife, with costs; and reverse the same as to *Valentine P. Luckett*, *Elizabeth Clapham*, *James B. Murray*, *Eliza Thompson*, *Peter A. Jay* and *Eliza Ratcliffe*, and will pass a decree for the sale of the real estate mentioned in the proceedings called "*Conjuror's Disappointment*," "*Georgia*" and "*Gleanings*," or so much thereof as may be necessary to pay and satisfy the complainant the sum of $333.33⅓, (being the value of £100 *Virginia* currency,) with interest thereon from the 12th February 1788, and the costs of this suit, unless said respondents bring into this court the said sum of money and interest on or before the 1st day of July 1840.                    DECREE REVERSED.

At June term 1840, the appellees filed the following petition in this cause.

*To the Honorable the Judges*
       *of the Court of Appeals for the Western Shore.*

The petition of *Peter Augustus Jay*, one of the defendants to this cause, and of *Betsy C. Mason*, and of *Betty Mason*, *Matilda Mason*, *Ann Mason*, *Thompson F. Mason*, *John Mason*, *Virginia Mason*, *Caroline Morris Mason*, *Arthur Mason*,

and *Clapham Mason,* which *Betty, Matilda, Ann, Thompson, John, Virginia, Caroline, Arthur* and *Clapham,* are infants un-der the age of twenty-one years, and now sue, by the said *Betsy C. Mason,* their mother and next friend humbly shews, that the object of this suit was to procure a decree for a sale of certain lands in the proceedings mentioned, in order to sat-isfy certain claims of the complainants, which are therein set forth. And that said cause was so proceeded in that, on the 10th October 1837, a decree was passed dismissing the bill of complaint with costs.

That from the said decree, the complainant appealed to this honorable court, where such proceedings were had, that at *December* term last past, the said decree in so far as it related to the said *H. W. Luckett, Benjamin Shriver,* junior, and *Mary Elizabeth* his wife, and *Stephen White* and *Ann* his wife was affirmed, and in so far as it related to the defendants *Val-entine P. Luckett, James B. Murray, Elizabeth Clapham, Eliza Thompson, Peter A. Jay* and *Eliza Ratcliffe* was reversed with costs, and certain of the lands in said decree described, are directed to be sold by *Somerville Pinkney* esquire, a trus-tee therein named for the purpose, in order to satisfy unto the said complainants the sum of $333.33⅓ with interest and costs as are in said decree specified, unless the said last named de-fendants, or some of them, should pay to the complainant the said principal sum of money with interest and costs, by the first day of July next, as by the proceedings in said cause now remaining in this court will appear.

And your petitioners further charge, that the complainant in his aforesaid bill alleged, that the said defendants, *Eliza Thompson, Peter A. Jay,* and *Eliza Ratcliffe,* did not reside in the *State of Maryland,* and in progress of the suit, procured an order of publication to be passed against them as non-resi-dent defendants, and upon proof of publication of such order and without service of any process whatsoever on them, pro-cured a decree to be passed for taking his bill of complaint *pro confesso,* as against the said defendants; and the final de-cree in the cause was likewise passed against them as non-

residents as aforesaid. And your petitioners aver that, in fact the said *Thompson, Jay* and *Ratcliffe,* (if the said *Ratcliffe* is a real person and known to these petitioners) at the time of filing the aforesaid bill of complaint in this cause against them, were, and ever since have been, and the said *Jay* and *Ratcliffe,* the said *Thompson* being lately deceased, now are non-residents of this State, and never had notice of the proceedings in this suit, until after the decree had been rendered in the Court of Chancery, as aforesaid. And your petitioners further charge that, pending the aforesaid proceedings, the interest which it is therein supposed, was vested in the said *Thompson, Jay* and *Ratcliffe,* in the aforesaid lands, so as aforesaid decreed to be sold, became vested beneficially by assignment in your petitioners, *Betsy C. Mason* and her children, who have at all times been, and now are, non-residents of this State.

And your petitioners further charge that, they are aggrieved by the aforesaid decree of this honorable court, which is erroneous for many reasons, as they will be prepared to show in due time; and they did therefore lately file their petition to the Chancellor, praying a review of the aforesaid decree, according to the form of the act of Assembly in such case made and provided, and praying leave to file their bill of complaint in the cause, in order that the aforesaid matters of defence may properly be put in issue, and the said cause reviewed and determined as if the said parties had originally appeared, and in the mean time that the said trustee, *Somerville Pinkney,* may be enjoined and restrained from proceeding to execute said decree by a sale of the aforesaid lands. But his honor the Chancellor, upon consideration of said petition, refused to pass any such order as was prayed for, and refused to enjoin and restrain the said trustee as aforesaid, as by a copy of their aforesaid petition, and the order thereto certified, according to the form of the act of assembly in such case made and provided and herewith filed will appear.

Whereby your petitioners aver, they are much aggrieved, and are wholly without redress, unless this honorable court

will interfere for their protection. Wherefore they pray your honors to pass an order, declaring the right of your petition-ers to review the aforesaid decree of this honorable court; and authorising and directing the Chancellor to entertain a bill to be filed by your petitioners, for the purpose of reversing the aforesaid decree, in manner and form as directed by the afore-said act of assembly, and in the mean time, to enjoin and re-strain the aforesaid complainant, and trustee, from proceeding to execute the aforesaid decree, and that your honors will grant them such further relief as shall seem meet, and as, &c.

ARCHER, J., delivered the opinion of this court.

The right of the party to have a review under the act of 1795, ch. 88, we are inclined to believe exists, although the decree was passed against the petitioners in the Court of Ap-peals. No other construction of that act would reach the in-tention of the legislature. They designed to give to non-resi-dents the privilege within a limited time of reviewing decrees in equity against them. The act, it is true, is in terms confined to a review of decrees in the Chancery Court. But a liberal interpretation should be given to the law, to effectuate the le-gislative intention, and to reach mischiefs intended to be reme-died by the law. This could only be done by extending the right to file a bill of review, in all cases of decrees of a court of equity, against the persons described in the act, whether such decrees are of the appellate, or of an inferior jurisdic-tion. But we cannot grant the injunction prayed for in this case—although we think the Chancellor ought to have done so, on a *proper application,* and upon the execution and filing such a bond as the Chancellor should approve, and at such time as he should prescribe—because the petition of the party has been dismissed by the Chancellor, and if we allowed the injunction this singular anomaly would be presented: that an injunc-tion would exist in a dismissed cause. A different case would have been presented had, the Chancellor entertained the peti-tion, and refused the injunction. We could then, under the act of 1832, ch. 302, with propriety, on a proper case being

made, have awarded the injunction prayed for.    We have now no power to act on the propriety of the order dismissing the petition, and feel ourselves obliged to refuse the injunction. It is apparent that the Chancellor was restrained from action, from an apprehension of encroaching on the authority of the appellate court.    But whether correct in this or not, we think the petitioners should have an opportunity of filing a bill of review, and of having in the mean time a preventive remedy against the absolute loss of property, as to them, pending the controversy.    But to entitle the party to an injunction pending the rehearing, he ought to present a *prima facie* case; such a state of facts or of circumstances as, if true, would entitle him to a reversal of the decree.    No such facts are stated in the petition to the Chancellor, and no proper case being presented, independent of the difficulty growing out of a dismissal of the petition by the Chancellor, we could not award an injunction as now prayed, &c.

As the Chancellor has dismissed the petition without prejudice, it is probable, upon knowing the views of the judges of this court, he might entertain a new petition, and grant an injunction, pending the application for a review.    On the first impression, there would seem to be a difficulty, in filing a bill of review in chancery, in relation to a decree of the Court of Appeals.    But had the decree reserved in terms, a right to non-residents to go into chancery, and review the decree within the period prescribed by law, there would have been no difficulty.    Now although the decree has not this provision, yet if our construction of the act of 1795 be correct, then the law attaches itself to the decree, and the petitioners would be entitled to a review, in the same manner as if the decree had made a special provision for such a review.